**[J-68-2022] [MO: Brobson, J.]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**WESTERN DISTRICT**

| | | |
|---|---|---|
| ALYSSA MCLAUGHLIN AND WILLIAM MCLAUGHLIN | : | No. 7 WAP 2022 |
| | : | |
| | : | Appeal from the Order of the |
| | : | Superior Court entered July 28, |
| v. | : | 2021 at No. 1115 WDA 2020, |
| | : | affirming the Order of the Court of |
| | : | Common Pleas of Washington |
| AMIT NAHATA, M.D.; KATHRYN SIMONS, | : | County entered February 5, 2020 at |
| M.D.; ANNE F. JOSIAH, M.D.; THOMAS | : | No. 2015-3223 and remanding. |
| PIROSKO, D.O.; JESSIE GANJOO, M.D.; | : | |
| ASHLEY  BERKLEY, D.O.; THE | : | ARGUED:  October 26, 2022 |
| WASHINGTON HOSPITAL; AND | : | |
| WASHINGTON HEALTH SYSTEM | : | |
| WASHINGTON HOSPITAL | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| DIALYSIS CLINIC, INC. | : | |
| | : | |
| | : | |
| APPEAL OF: DIALYSIS CLINIC, INC. | : | |

<u>**CONCURRING OPINION AND OPINION IN SUPPORT OF AFFIRMANCE**</u>

**JUSTICE WECHT** **DECIDED:  July 28, 2023**

Dialysis Clinic, Inc. ("DCI") is a healthcare organization that employs nephrologists who provide dialysis and kidney care to patients.  DCI requires the physicians that it employs to hold medical staff privileges at various facilities, including the Washington Hospital ("Hospital").  DCI employees Jessie Ganjoo, M.D., and Amit Nahata, M.D., held staff privileges at the Hospital.  In 2013, Alyssa McLaughlin was admitted to the Hospital, where she received substandard care from Dr. Ganjoo and Dr. Nahata.  According to the

Hospital, Dr. Ganjoo and Dr. Nahata treated Ms. McLaughlin in the course and scope of their employment with DCI.

Ms. McLaughlin and her husband William McLaughlin sued the Hospital under Section 516 of the Medical Care Availability and Reduction of Error ("MCARE Act"), which permits patients to sue hospitals directly under a theory of ostensible agency.[1] The McLaughlins obtained a verdict for which the Hospital is liable by operation of Section 516, and the Hospital obtained a verdict against Dr. Ganjoo and Dr. Nahata through indemnification for this judgment. Having established that the negligent physicians were obligated to indemnify the Hospital, the Hospital filed an action against DCI. The Hospital now seeks to shift its liability through indemnification to DCI as the corporate employer of the negligent physicians or, in the alternative, to apportion liability between DCI and the Hospital under a theory of contribution.

The Court holds that the law permits the Hospital to pursue its claim of contribution against DCI.[2] The OISPA would hold that the Hospital is not entitled to pursue its claim

---

[1]  Section 516 provides:

(a) Vicarious liability.--A hospital may be held vicariously liable for the acts of another health care provider through principles of ostensible agency only if the evidence shows that:

(1) a reasonably prudent person in the patient's position would be justified in the belief that the care in question was being rendered by the hospital or its agents; or

(2) the care in question was advertised or otherwise represented to the patient as care being rendered by the hospital or its agents.

(b) Staff privileges.--Evidence that a physician holds staff privileges at a hospital shall be insufficient to establish vicarious liability through principles of ostensible agency unless the claimant meets the requirements of subsection (a)(1) or (2).

40 P.S. § 1303.516.

[2]  I join Sections I, II, III.A, and III.C of the Opinion of the Court. I do not join Sections III.B and IV. For ease of discussion, I refer to of the Opinion in support of a partial affirmance and a remand with instructions as the OISPA.

of indemnification. I agree that contribution is available to the Hospital because two parties that are vicariously liable for a common agent are joint tortfeasors within the meaning of Section 8322 of the Uniform Contribution Among Joint Tort-feasors Act ("UCATA").[3] There is no legal support for DCI's argument that contribution is unavailable between parties who are vicariously liable for a plaintiff's injuries.[4]

As this case proceeds on remand, the factual question of the parties' actual control over the negligent physicians as their common agent will be relevant to determining DCI's vicarious liability. The factual question of control will likewise be relevant to apportioning liability between DCI and the Hospital under the Hospital's claim for contribution. Under principles of agency law, an agency relationship "results from (1) the manifestation of consent of one person to another [that] (2) the other shall act on his behalf and subject to his control, and (3) consent by the other so to act."[5] Within this relationship, the principal is vicariously liable for the negligence of the agent if such negligence was committed within the scope of employment.[6] The reason that the law imposes this kind of vicarious liability is because the principal "has the right to exercise control over the physical activities" of the agent "within the time of service."[7] If the employee or agent is negligent,

---

[3]     42 Pa.C.S. §§ 8321-27.

[4]     *See* Appellant's Br. at 45.

[5]     *Smalich v. Westfall*, 269 A.2d 476, 480 (Pa. 1970) (citing *Chalupiak v. Stahlman*, 81 A.2d 577, 580 (Pa. 1951); Restatement (Second) of Agency § 1(1) (1958)).

[6]     *Tayar v. Camelback Ski Corp., Inc.*, 47 A.3d 1190, 1196 (Pa. 2012) (recognizing that a corporation, which acts through its officers, employees, and other agents, generally is vicariously liable for acts committed by its employees in the course of employment); *Travelers Cas. & Sur. Co. v. Castegnaro*, 772 A.2d 456, 460 (Pa. 2001) (concluding that a principal is liable for the negligent acts and torts of its agents that are committed in the agent's scope of employment); *Smalich*, 269 A.2d at 481; *Builders Supply Co. v. McCabe*, 77 A.2d 368, 370 (Pa. 1951).

[7]     *Smalich*, 269 A.2d at 481.

the injured party may recover against the employer or principal on the theory of *respondeat superior*.[8]

For a principal to be held liable for an agent's negligence, the law requires (i) that the principal maintain the right of control over the manner in which the work is performed and (ii) that the negligent conduct was within the agent's "scope of employment."[9] The hallmark of the principal-agent relationship is the right of the principal to control not only the objective to be achieved by performance of the work, but also the manner in which that work is performed. As this Court has described:

> A master is one who stands to another in such a relation that he not only controls the results of the work of that other, but also may direct the manner in which such work shall be done. A servant is one who is employed to render personal services to his employer otherwise than in the pursuit of an independent calling, and who in such service remains entirely under the control and direction of the latter.[10]

Of all the pertinent factors, the right to control is the most important in determining the existence of a master-servant relationship.[11]

---

[8]     *Builders Supply*, 77 A.2d at 370.

[9]     *Orr v. William J. Burns Int'l Detective Agency*, 12 A.2d 25, 27 (Pa. 1940) ("It is, in general, sufficient to make the master responsible that he gave to the servant an authority, or made it his duty to act in respect to the business in which he was engaged when the wrong was committed, and that the act complained of was done in the course of his employment.") (citing *Brennan v. Merchant & Co., Inc.*, 54 A. 891, 892 (Pa. 1903)); *Schroeder v. Gulf Refining Co.,* 150 A. 663, 664 (Pa. 1930) (holding that if a tortious act occurs while the servant is employed in the "usual course" of the master's business, and the servant is acting for the benefit of the master, there is a presumption that the act was within the scope of employment).

[10]     *Joseph v. United Workers Assoc.*, 23 A.2d 470, 472 (Pa. 1942).

[11]     *See, e.g., Smalich*, 269 A.2d at 481 (discussing the central role of control in determining an agency relationship).

More than one party may be vicariously liable for the negligent acts of a physician.[12]  As we explained in *Yorston*:

> Physicians and surgeons, like other persons, are subject to the law of agency and a physician may be at the same time the agent both of another physician and of a hospital even though the employment is not joint. *McConnell v. Williams*, [65 A.2d 243 (Pa. 1949)].  In determining whether a person is the servant of another it is necessary that he not only be subject to the latter's control or right of control with regard to the work to be done and the manner of performing it but that this work is to be performed on the business of the master or for his benefit.  *McGrath v. Edward G. Budd Manufacturing Co.,* [36 A.2d 303, 305 (Pa. 1944)].  Actual control, of course, is not essential.  It is right to control which is determinative.  On the other hand, the right to supervise, even as to the work and the manner of performance, is not sufficient; otherwise a supervisory employee would be liable for the negligent act of another employee though he would not be the superior or master of that employee in the sense the law means it.  Restatement (Second), Agency, § 220(1) (1958); *Commonwealth to the Use of Orris v. Roberts*, [141 A.2d 393 (Pa. 1958)].[13]

Whether the power of control was sole or joint in a particular scenario is a question of fact for the jury.[14]

In the case at bar, the two physicians were employed by DCI while simultaneously working and maintaining staff privileges at the Hospital.  The trial court correctly observed that the factual background of this case includes unrebutted evidence that Dr. Ganjoo and Dr. Nahata were DCI's employees when they provided negligent care to Ms.

---

[12]     *Tonsic v. Wagner*, 329 A.2d 497, 500-01 (Pa. 1974); *Yorston v. Pennell*, 153 A.2d 255, 259-60 (Pa. 1959);  *Kissell v. Motor Age Transit Lines*, 53 A.2d 593, 596 (Pa. 1947).

[13]     *Yorston*, 153 A.2d at 259–60.

[14]     *Tonsic*, 329 A.2d at 500; *Kissell*, 53 A.2d at 595-96; *Dunmire v. Fitzgerald*, 37 A.2d 596, 599 (Pa. 1944) (holding that, if it is not entirely clear who is the controlling master, and the evidence supports different inferences, it is for the jury to determine the question of agency).

McLaughlin.[15]  DCI has offered no evidence to the contrary.[16]  As the corporate employer of the physicians, DCI would be vicariously liable for acts committed by them as employees acting in the course of their employment.[17]  As the hospital in which the injuries occurred, the Hospital is vicariously liable for the physicians' conduct through principles of ostensible agency pursuant to Section 516 of the MCARE Act.  Consequently, there are two entities that are vicariously liable for the physicians' negligence:  DCI as the corporate employer and the Hospital as the ostensible principal.

The parties and the trial court agree that control is central to establishing DCI's vicarious liability and to guiding the court's apportionment of liability between the two vicariously liable entities.  In particular, there are contested facts as to whether and to what extent DCI exercised control over Drs. Ganjoo and Nahata.[18]  On the issue of contribution, the trial court denied DCI's motion for summary judgment in order to permit the case to proceed to trial to apportion liability, citing *Sleasman v. Brooks*, 32 Pa. D. & C.3d 187, 190 (Pa.Com.Pl. 1984).  In *Sleasman*, apportionment between two co-employers was based upon joint control over their common co-employee.  Relying upon the persuasive authority of *Sleasman*, the trial court here intends to apportion liability between DCI and the Hospital based upon their respective control of Drs. Ganjoo and Nahata.  The trial court explained:

> From this trial judge's view, the equities of this dispute drive the decision to put [the Hospital's] contribution claim to a jury.  Neither [the Hospital], an ostensible employer, nor DCI, the actual employer, should be permitted to escape liability without a full and fair hearing.  The facts and circumstances surrounding who controlled Drs. Ganjoo and Nahata in their treatment of

---

[15]   Tr. Ct. Op., 7/15/2020, at 9.

[16]   *Id.* at 10.

[17]   *See Tayar*, 47 A.3d at 1196.

[18]   Tr. Ct. Op., 2/5/2020, at 6-11.

Mrs. McLaughlin should be determined. Then the financial burden should be apportioned accordingly.[19]

DCI has taken the position that, if contribution is available as a matter of law, then apportionment based upon respective control is necessary in order to allocate vicarious liability.[20] And the Hospital, of course, agrees with the trial court's decision to proceed to a trial to apportion liability under its claim for contribution. The factual question of control remains to be resolved in this case and would appear to be determinative of the issue of contribution.

Turning to indemnification, I disagree with the OISPA's preclusion of this claim. The OISPA predicates this limitation upon its belief that one vicariously liable party cannot shift its liability to another vicariously liable party.[21] The OISPA contends that, by establishing the Hospital as the ostensible principal, Section 516 forecloses the Hospital's claim for indemnification against DCI.[22] I cannot agree. As a matter of law, Section 516 bears no relevance to the question of whether the Hospital is able to establish a factual predicate to support its claim for indemnification by the corporate employer of the negligent physicians.

Indemnity is a common law equitable remedy that is aimed at preventing an unjust result.[23] Indemnification generally is available where a party was held liable on the basis of "fault that is imputed or constructive only, being based on some legal relation between

---

[19]     Tr. Ct. Op., 7/15/2020, at 22.

[20]     Appellant's Br. at 15; 53 (providing that if the Court is inclined to allow contribution here, then the trial court's decision to have a trial to apportion vicarious liability based upon respective control should not be disturbed).

[21]     OISPA. at 29.

[22]     OISPA. at 30.

[23]     *City of Wilkes-Barre v. Kaminski Bros.*, 804 A.2d 89, 92 (Pa. Cmwlth. 2002).

the parties."[24]  To this end, indemnification shifts the entire responsibility for damages from a party who "without active fault on his own part, has been compelled, by reason of some legal obligation, to pay damages occasioned by the initial negligence of another, and for which he himself is only secondarily liable."[25]  In this way, indemnity seeks to shift the burden of the loss to the "defendant who was actually responsible for the accident which occasioned the loss."[26]  Only a party that is free from fault is entitled to indemnification.[27]

The availability of indemnification therefore depends both upon a legal obligation and a lack of fault in the party seeking indemnification.  In *Builders Supply*, the Court rejected the third party plaintiff's claim for indemnity because there was a binding judgment that the third party plaintiff's own negligence was a contributing factor in the accident.[28]  In *Sirianni*, the Court rejected the City of Philadelphia's claim for indemnity because the City's own negligence contributed to the accident.[29]  These cases confirm

---

[24]  *Builders Supply,* 77 A.2d at 371.

[25]  *Id.* at 370; *Sirianni v. Nugent Bros., Inc.*, 506 A.2d 868, 871 (Pa. 1986) (providing that common law indemnity is available "only when a defendant who has been held liable to a plaintiff solely by operation of law seeks to recover his loss from a defendant who was actually responsible for the accident which occasioned the loss").

[26]  *Sirianni*, 506 A.2d 871.

[27]  *Id.* (holding that the proper inquiry concerning a claim for indemnity is "whether the party seeking indemnity had any part in causing the injury"); *Builders Supply*, 77 A.2d at 370.

[28]  *Builders Supply*, 77 A.2d at 374.

[29]  *Sirianni*, 506 A.2d at 871-72.

that a party's right to indemnity depends upon that party being free of any fault in causing the injury.[30]

If the Hospital is free of fault, then *Builders Supply* will support its claim for indemnity. Giving several examples of cases in which a right to indemnity was found to exist, the *Builders Supply* Court highlighted *Philadelphia Co. v. Cent. Traction Co.*, 30 A. 934, 936 (Pa. 1895):

> Many other illustrations might, of course, be given, as, for example, where a person injured by the leakage of gas from a defective pipe recovered damages from the gas company which maintained the pipe, [and] the gas company was held entitled to recover indemnity from a street railway company whose negligent excavation in the street had caused the pipe to break.[31]

Our precedents support permitting one corporation to seek indemnification from another corporation whose employees committed negligence as a matter of law.

As a factual matter, indemnification depends upon fault. In this respect, the Hospital maintains that indemnification is available to it because it acted without fault. DCI maintains that the Hospital's corporate negligence contributed to the injuries and therefore forecloses the Hospital's indemnification claim.[32] The record contains some evidence of corporate negligence that, if accepted as true, would establish the Hospital's direct liability for the McLaughlins' harm.[33] In particular, DCI identified two experts who

---

[30]     *Id.* at 871 ("Whether an owner of property may be primarily, or ultimately, responsible for injuries occurring on that property is not the proper inquiry. Rather a court must look to whether the party seeking indemnity had *any part* in causing the injury.").

[31]     *Builders Supply*, 77 A.2d at 370-71 (citing *Philadelphia Co.*, 30 A.3d at 936).

[32]     "Corporate negligence is a doctrine under which the hospital is liable if it fails to uphold the proper standard of care owed the patient, which is to ensure the patient's safety and well-being while at the hospital. This theory of liability creates a nondelegable duty which the hospital owes directly to a patient." *Thompson v. Nason Hosp.*, 591 A.2d 703, 707 (Pa. 1991).

[33]     Tr. Ct. Op., 2/5/2020, at 10.

have offered opinions critical of the failure of the Hospital's staff to monitor changes in Ms. McLaughlin's condition, contributing to her injuries.[34] DCI's evidence could show the Hospital's own fault and defeat the Hospital's indemnity claim.[35] That remains to be seen. Unless something precludes it, I see no reason why the Hospital would not have the right to seek indemnification from DCI.[36]

According to the OISPA, Section 516 precludes the Hospital's right to seek indemnification. The OISPA acknowledges that one corporate entity can obtain indemnification from another corporate entity whose negligent employees were at fault. Yet the OISPA declines to apply this rule of law to the Hospital's benefit because the Hospital is the ostensible principal of the negligent physicians under Section 516.[37] Even if it were equitable to allow the Hospital the opportunity to establish the facts necessary

---

[34] *See Thompson*, 591 A.2d at 709 ("When there is a failure to report changes in a patient's condition and/or to question a physician's order which is not in accord with standard medical practice and the patient is injured as a result, the hospital will be liable for such negligence.").

[35] *See Builders Supply*, 77 A.2d at 374 (rejecting a plaintiff's claim for indemnity because of proof of the plaintiff's fault in causing the injury); *Sirianni*, 506 A.2d at 871-72 (rejecting a city's claim for indemnity based upon the city's own negligence).

[36] The OISPA posits that, where two principals are vicariously liable for a common agent, there is no difference in the legal obligation owed to the plaintiff that would permit indemnification by either principal. OISPA. at 29. I cannot agree. As explained above, indemnification depends upon fault, thus differentiating the obligations owed to the plaintiff as between two vicariously liable principals.

*Builders Supply* does not support precluding the Hospital's claim for indemnification. *See* OISPA. at 30, n.24. *Builders Supply* discussed not only how indemnification operates between a principal and agent, 77 A.2d at 370, but also how it operates in other scenarios. One such scenario was *Philadelphia Company*, 30 A. 934 at 936, which, as described above, contemplated indemnification from one corporate entity to another. 77 A.2d at 370-71. Consistent with *Philadelphia Company*, the Hospital is entitled to the opportunity to establish its claim for indemnification against DCI as the employer of the physicians whose negligence caused the loss.

[37] OISPA. at 30.

to support a right of indemnification, the OISPA believes that Section 516 precludes this outcome. The OISPA reasons that, because the MCARE Act designates the Hospital as the ostensible principal, the Hospital cannot shift its responsibility for damages to the actual employer.[38]

I cannot agree. Although Section 516 designates the Hospital the ostensible principal for purposes of the McLaughlins' negligence action, it says nothing about allocating or shifting vicarious responsibility for the judgment.

Section 516 codifies the common law of ostensible agency as applied to hospitals. After this Court recognized *respondeat superior* as a basis for hospital liability in *Tonsic*, the Superior Court adopted a theory of ostensible agency for a hospital's vicarious liability for the negligence of a physician who was an independent contractor rather than an employee.[39] The ostensible agency theory adopted therein was premised upon Section 429 of the Restatement (Second) of Torts. Under this theory, "a hospital could be held liable for the negligence of an independent contractor physician where (1) the patient looked to the institution, rather than the individual physician, for care, or (2) the hospital 'held out' the physician as its employee."[40]

With Section 516 of the MCARE Act, the General Assembly codified the vicarious liability of hospitals under principles of ostensible agency, rendering hospitals vicariously liable (under certain circumstances) for the negligence of health care providers practicing in the hospital. The effect of Section 516 is to allow an injured patient to sue the hospital in which negligence occurred without proving that the hospital employed the provider or that the provider was acting as the hospital's agent. This ensures that the plaintiff

---

[38] *Id.*

[39] *Capan v. Divine Providence Hosp.*, 430 A.2d 647 (Pa. Super. 1980).

[40] *Green v. Pennsylvania Hosp.*, 123 A.3d 310, 317 (Pa. 2015).

recovers directly from the hospital and avoids the independent contractor doctrine that would otherwise shield the hospital from liability.[41]

The ostensible agency doctrine codified in Section 516 does nothing to limit a hospital's ability to seek indemnification from a corporate employer of negligent physicians. Section 516 simply serves as the law that operates to hold the Hospital liable. The permissive language of Section 516—that a hospital "may" be held vicariously liable—does not provide that ostensible agency is the exclusive means for establishing vicarious liability for a physician's negligence. In short, Section 516 establishes the *legal obligation* necessary for indemnification; the factual predicate remains to be established.

The Hospital's claim for indemnification depends upon the Hospital's fault or lack thereof. This is a factual question for the jury to decide. The claim does not depend upon Section 516, which serves only as the legal obligation that compelled the Hospital to pay damages to the plaintiffs in the first instance. If the Hospital can establish that it is "without active fault" of its own, as it alleges, it may be entitled to shift the entire responsibility for damages to DCI as the employer of the negligent physicians.

Contrary to the OISPA, I do not view Section 516 as offering anything relevant to the equities. As the trial court held, neither the McLaughlins' choice of defendants nor Section 516 should compel the Hospital to pay for liabilities created by DCI's employees while acting within the course and scope of their employment.[42] Denying the Hospital the opportunity to seek indemnification for harm allegedly caused by DCI's employees, when

---

[41]     *See Kinney-Lindstrom v. Med. Care Availability and Reduction of Error Fund*, 73 A.3d 543, 555 (Pa. 2013) (recognizing that the MCARE Act was enacted to ensure "fair compensation to the injured victim of malpractice" and to enable health care providers to obtain affordable professional liability insurance).

[42]     Tr. Ct. Op., 7/15/2020, at 16; *see also Burch v. Sears, Roebuck & Co.*, 467 A.2d 615, 622 (Pa. Super. 1983) (observing that indemnification, like contribution, is available even against defendants that the plaintiff does not sue).

the Hospital may yet establish that it acted without fault, is inequitable and unjust. There is no authority for the proposition that a hospital's vicarious liability under principles of ostensible agency insulates the corporate employers of negligent physicians from liability. The OISPA reliance upon Section 516 as a limitation on the Hospital's ability to establish indemnity is contrary to MCARE's goal of keeping medical malpractice insurance premiums affordable, as it would preclude indemnification where the requirements are otherwise satisfied. Section 516 simply is not relevant to the availability of indemnification to the Hospital.

A fair allocation of liability among vicariously liable principals in this case depends upon further factual development. Whether the Hospital is entitled to indemnification, contribution, or neither will depend upon what level of relative control it exercised over the negligent physicians and whether the Hospital was at fault for the McLaughlins' injuries. If, on remand, the Hospital is able to establish that DCI exclusively controlled Dr. Ganjoo and Dr. Nahata and that the Hospital was not at fault because it did not engage in corporate negligence, then it would establish a claim for indemnification. Otherwise, having failed to establish its entitlement to indemnification, the Hospital would be entitled to contribution based upon the respective control of the Hospital and DCI.

Permitting the Hospital to seek indemnification and contribution from the corporate employers of negligent physicians allows for factual development on the issue of which entity exercised the control necessary to deter negligence, and therefore maintains the ability to implement policies to reduce negligence. Allocating or shifting responsibility based upon the degree of control that vicariously liable defendants exercised over the negligent physicians will effectuate the aim of Section 516 to compensate injured plaintiffs while also placing the financial burden of negligent physicians on the party best situated

to prevent similar occurrences of negligence.  I would afford the Hospital the opportunity to prove the factual basis of its claim for indemnification as well as contribution.

Chief Justice Todd and Justice Donohue join this Concurring Opinion and Opinion in Support of Affirmance.